Case No. 11-3758, Illinois Guaranty Fund v. Virginia Surety Company If both attorneys would just step up briefly and identify yourselves for the record. Certainly, Elizabeth Capoletti on behalf of the Attorneys. And Murray Pixon on behalf of the Attorneys. All right. I'm sure each of you has been here before, but if not, each side will have approximately 15 minutes to present their argument. And from that, Capoletti, you may save out some time for rebuttal. All right? All right. Thank you. Okay. So with that, we will proceed. Would you like me to reserve the time now for rebuttal? Whatever you wish. If I could, I'd like to reserve five minutes for rebuttal. All right. Good morning, Justices, Counsel, and may it please the Court. My name is Elizabeth Capoletti on behalf of the Appellant Virginia Surety Company. It is respectfully submitted that the Court erred in granting Illinois Insurance Guaranty Fund's motion for summary judgment. And they further erred in denying Virginia Surety's motion for summary judgment. Clearly, the question centers on whether Virginia Surety provided an insurance policy to cover borrowed persons such as Mr. Sandusky. And I would emphatically submit to you the answer is no. Insurance was provided for Mr. Sandusky, and that was through his employer, his employer being TTC. Let me ask you a question about the facts. Yes. Is, I'll ask opposing counsel as well, but is it your understanding that TTC and MGM had some kind of formalized agreement in place in which TTC would be paying for the salary and for the workers' comp benefits of the gentleman who was injured? That is correct. It's not in the record, though. That is correct. And is there some reason that was not in the record? I don't know how to answer that for you. I don't know if it was not offered into the record other than to tell you that MGM was never really made a party to the underlying workers' compensation case. All right. But somewhere there is, to your knowledge, an agreement that effectuated that TTC would pay for the salary and all insurance benefits that were due to the workers, the employees. That is correct. All right. I just want to get that out, and I'll ask counsel if he agrees. Okay. And to your point, to follow up to that, TTC, in fact, did pay the benefits. I mean, they did pay for the workers' comp. Yes, until they became insolvent. That is correct. And then the fund stepped in. That is correct. And at that point, that is exactly right. The fund did step into TTC's shoes at that point at the Workers' Compensation Commission. But so the question really is, this policy of insurance that was procured by MGM, was it to cover employees such as Mr. Sandusky, who are, in fact, employees of TTC, who actually had their own insurance policy for workers' compensation benefits? And I would state to you that the evidence in that regard is very clear. I mean, MGM contracted with Virginia Surety, said to them, hey, we have 60 actual employees that work at this facility, and we would like insurance for these 60 employees. And as part of that request for the insurance, they specifically stated that there were other persons at that facility, but those other persons were employed by TTC, who also provided coverage. And they, in fact, proved that that coverage was provided to those other persons at that facility. But if you look at the general language, though, of 546 of the funds reimbursement statutory section that they rely on heavily, it does say in there that if the claim under such other policy arises from the same facts, injury, or loss that gave rise to the covered claim, couldn't one reasonably argue that that language suggests that the claim, the injury, the facts, are covered by this other policy? Well, that would assume that other policies, in fact, exist. And that's what I have been arguing, that there is no other insurance. It has to assume that there is, in fact, other insurance. And it seems that the circuit court converted this policy of insurance to other insurance by bootstrapping in the language from the loaning and borrowing portion of the statute, the 1A3 language, into the section 4 portion of the statute, which is the portion that talks about the requirements of insurance. And I would submit to you that the language from the loaning and borrowing section does not convert persons that are working at a facility into employees as it relates to trying to cover all of your employees at one facility. I mean, the language is clear in the statute where it says that. But my position is that MGM, in fact, did do their obligation. They did cover all of their employees. The absence of an actual policy doesn't really preclude the court from finding coverage when there is an employee without workers' compensation insurance, correct? Isn't that what the court did in Evans? That's correct. But what I'm saying to you is that they do have coverage. They, in fact, had coverage from TTC. And I'm saying that that coverage doesn't all of a sudden convert our policy into coverage. They did, in fact, have coverage from TTC. And TTC paid until their bankruptcy. And then the funds stepped in. But there's nothing in the record relative to whether or not there was even a hearing as to establishing this loaning and borrowing relationship, as you were speaking to, as to whether or not this contract exists. So wasn't there actually contrary evidence? Because didn't individuals from MGM actually testify that they specifically did not pay for the workers' compensation coverage of the loaned employees? Because that company, they were actually insuring just the, I don't know, how do you describe them, the employees that were permanently based there, I guess. I agree with you. And that's exactly this. I mean, they were, I guess I qualify them as the actual employees. I mean, they were insuring the actual employees, those being those 60 employees that were, in fact, at the plant. Yes. But what about the provisions of the act that doesn't allow an insurance company, or actually the employer rather, to not cover everyone working on its own property, every employee, whether they're borrowed or loaned? Well, and I guess I would indicate to you that they did, in fact, cover all their employees. They covered all 60 employees that were there. The employees, or the persons that were actually at the plant from TTC were not their employees. Their employees, they were employees of TTC. But weren't they loaned employees? They were leased employees. Leased, loaned, whatever you want to call them. Sure. I mean, they worked there. But I would submit to you that that is a different provision that we come under relative to the loaning and borrowing. And we, in fact, the state does, in fact, contemplate actual leasing companies. I mean, there is a whole statute. Yes, there's a statute. And the statute also permits that the two employers can, by contract, establish who will be the one that's paying for those premiums to cover the workers' compensation insurance. That's correct. And that's what occurred in this case. That is correct. That's exactly what has occurred in this case. Although we don't have the contract that apparently set up this agreement. That is correct. We don't have the contract. But based upon the complaint, as well as the admissions of, I apologize, the gentleman that provided his deposition, I mean, it was clear that that was the relationship that was set up between the two, that TTC was leasing these employees to MGM. So I would submit to you that that relationship is allowable, contractually allowable. They followed their relationship, and that MGM in no way did not meet its obligations as it related to Section 4. It did, in fact, cover all of its employees. And, therefore, the insurance policy that was issued by Virginia Surrey was not a policy which, in fact, covered Mr. Sandusky's injury. And because it wasn't, it's not counted as other insurance. Well, what about the provision that makes both the borrowing and the loaning employer liable under the Act for the employees' workers' compensation? I appreciate that it makes them jointly separate and liable, but it is not absolute. I mean, the Act itself contemplates the fact that there's going to be leased employees. So the Act says, hey, borrowed employees, you do have liability here. If you do not pay, then it goes to loaning employees. Loaning employees then must pay, and then they can ask for a right for reimbursement back for the borrowing employee unless there's an agreement to the contrary. And the Act, in fact, designates leasing companies as loaning employees because it's contemplating these types of situations where loaning employees do bear the insurance because they are actually their employees so that they don't go back to the borrowing employee because there's an agreement to the contrary. And I believe there's actually also a case law out there that creates an indemnification agreement, and I think it's Kona, that states that if there is, in fact, an indemnification agreement, then that borrowing employee can come out of the cause of action. So, I mean, I think this is, in fact, contemplated, and I don't think that any of those obligations somehow did make an insurance policy between Virginia and Surety and MGM exist when one did not exist previously. And I also think that the policy itself and the terms itself are very clear in the fact that there was never a premium paid on behalf of the employees at MGM Company. MGM, the policy itself was very clear as to which salaries they were looking into as to how they determined the policy amounts. It was clear that those policy amounts were based upon the actual employees that were at that location. So I would submit to you that it is clear from the record that there is no policy between, for Virginia Surety to insure MGM as it relates to employees from TTC. Thank you. All right. Counsel? Thank you very much, Warren Powell. And your name again for the record? My name is Murray Pinkston, representing the appellee. May it please the Court. Mr. Pinkston, do you agree that there was an agreement between TTC and MGM? I don't know if it's TTC. It's TTC. Yeah, and MGM, that TTC would cover the salaries of the loaned employees. It would also pay for their workers' compensation insurance. That's a traditional statement of the contractual relationship between a loaning employer. But in this case, I'm asking you in this case. Judge, I honestly don't recall the contract as I see her today. Why was TTC then paying the benefits for the workers' compensation claim from the very beginning? Well, undoubtedly, they thought that they had the obligation to. I don't think that there was not a contract. I think there probably was one. I just can't tell the Court in good conscience that I'm aware of it. The way those contracts, as you're aware, the way those contracts generally work is that the contract says we'll take care of salary and we'll take care of workers' compensation insurance, among other things. Well, in this case, doesn't the record support that notion that, indeed, TTC was the employer for purposes of providing salary and insurance, specifically workers' compensation coverage, to this particular injured employee? TTC was an employer of this employee. All right. It was one of two employers. All right. Now, don't you think that your position, Mr. Pinkston, is suggesting that two companies should pay premiums at the same time for a covered worker? Isn't that really what you're asking? Judge, I think they're different questions than that. No, the way I would handle this particular situation would have been something entirely different, but I'm not sure that that's material. I'll be happy to deal with it if you'd like. Well, in this case, do you agree that there was at least one insurance company that was paying for workers' compensation coverage? And isn't that really all that the Act requires? No, the Act requires a lot of different things, and the Act has certain specific requirements with regards to what employers can and cannot do. I do believe that TTC, in its position as an employer, provided a workers' comp policy by credit general. And do you think that the Act requires that if one employer is paying premiums and is covering a particular employee, the injured employee here, that another company is required at the same time to insure for workers' compensation? I don't think that specific requirement is in the compact. However, I think that specific situation is addressed in the compact. And how? At 4A3, my statute that I'm relying on. It says that the entire compensation of liability of one employer in one location has to be in one insurer. That means that all of your employees at one location have to have the same compensation policy. That means that as an employee of both employers. Well, are you including then the loaned and borrowing employee portion of the workers' compact when you say that? Absolutely. Don't you think you have to read them all together? Absolutely. Absolutely. Especially the part where it says that the borrowing employer and the loaning employer are jointly and severally liable for workers' compensation benefits. Yes. And, you know, I think what that means is that the employee can never be left basically holding the proverbial bag. In other words, the employee has to have coverage, and it can go to the loaning employer or the borrowing employer to get its insurance when needed if that employee is injured. That situation can be brought about. However, that situation, all due respect, is not allowed by 4A3. That situation could possibly be brought about by an exception to 4A3, which is found in 4A4 by some other methodology that is approved by the commission. Now, that is approved by the commission as an application and an approval process. It obviously was not done in this situation. But that is the way that I would have handled your specific problem. I would have gone to the commission with an application. I have this. I have this. Is this okay? Is this enough? The commission, if they signed off on it, that would have been it. Does the record show, though, that the – well, you're saying that under the Act, two employers have to insure the worker. No, Judge, I'm not saying that at all. I'm saying that if you wanted to avoid that situation, there are things that could be done. However, one employer has to insure all of its employees at one location with one policy. It cannot, by itself, without approval, split its workers into two different jurors. Well, what case do you rely on that supports your position? What Illinois case? I rely on the statute, Judge. I rely on 4A3, and it's as clear as a bell. It says that this cannot be done. I think the statute is as clear as a bell, that an employee has to be covered by workers' compensation insurance. That's Section 4, Judge. I agree. An employee has to be covered. I don't think the legislature ever intended that two employers pay for the same coverage when one is already doing it. I don't think that was the purpose of the Act. The purpose of the Act is to make certain that every employee has coverage. And in this case, every employee did have coverage because TTC had a policy for workers' compensation. I mean, the record discloses that. And they were paying that until they became insolvent when the funds stepped in. I don't disagree with any of that, Judge. What I'm relying on is the clear direction of 4A3. There are some exceptions that you can work around 4A3. Well, what are they? 4A4. 4A4 is the first one. Two cases cited, you know, by each party are the other ways, with Section 317B. Well, what cases are you talking about? I'm talking about the case that I cited, general casualty, and the case that the appellant. Carole Tiley. Carole Tiley. And that was the case where the son left his father out of the workers' compensation policy. Attempted to. Yes, attempted to. into that, a policy of insurance, because in that case the employee had no workers' compensation coverage of any kind. Of any kind. I mean, those are the facts. Those are the facts. Yes. But I think the fact is. They had an employer. I mean, an employee cannot be left without coverage. No, an employee can be left without coverage under 317B. And that's what they attempted to do in the Tiley case. They said, we're going to attempt to withdraw you from coverage under 317B, which can be done. There are forms that can be filled out. The Carole Tiley case said, you didn't fill out those forms appropriately. They are not enough. Did that happen in this case? Did someone attempt to withdraw this gentleman? No. No. All right. And so to continue with the Carole Tiley case, they tried to execute an exception to 4A3, but the court held that it was not sufficient. And so you fall back to 4A3, meaning that all of the employees at this location were covered. That is like this situation. All of the employees at this location were covered under the Virginia surety policy. All of the employees for TTC were covered at this location as well. Were they not under the TTC policy? That's correct. Anything further? 4A3 is the critical issue from which all the rest of my arguments flow. It means that there is a Virginia surety policy of insurance that covers this injured worker. What policy was that? The Virginia surety policy at issue. That was other insurance? That was other insurance. That is other insurance. And where were the premiums or anything that was paid for that particular policy? I don't think that there is any question but that this policy was a valid policy covering MGM employees at the subject location. I don't think that there is any question about that. In fact, I'm telling the court. Well, the court, I mean the trial judge determined that. That's correct. All right. And there's actually no appeal on that issue. This Virginia surety policy was, in effect, covered MGM employees at this facility. Well, there's no question there was another policy, whether it was other insurance or whether it covered this particular employee is the whole point of this appeal. I think the policy covered all MGM employees. I think that there is no differentiation between borrow and the loaning. Under common law or especially under workers' compensation law, where it says that employers are jointly and severally liable. And I think that is to make certain that an employee is never left without any insurance. I don't doubt that at all, but we still run into 483. Now, from my argument that this Virginia surety policy does represent other insurance, that triggers the implication of the Guarantee Fund Act, which states that other insurance must be exhausted prior to the application of the fund for payment of workers' compensation claims. If there are any other questions, that's all I have. How does your strict reading of 483 go along with the existence or coincide with the existence of these labor and manpower service organizations that regularly send out employees on a temporary basis to work at job sites to fill labor requirements while there is agreements that the labor and manpower services cover salary and workers' compensation? It seems to me that your reading of, your strict reading of 483 puts the borrowing employer in a position where he's always responsible to, in effect, pay for double insurance. I certainly see that issue. You're right. These are traditional types of arrangements between employers, loaning, borrowing employers, that occur in Illinois across the state every single day. The only wrinkle here, the only reason that we find ourselves here today, is that the policy that the loaning employer bought, the credit general policy, credit general was liquidated earlier, well in the last decade. That's the only wrinkle that brings us here. If, presuming, That's an unusual circumstance, is it not? It's totally unusual. And that's why the fund was created, I assume. And my question is, why should the result of this unusual circumstance fall upon, in a negative way, to this insurance company that, you know, was humming along knowing that these employees were covered under another policy? I really think that the legislature intended that, you know, trying to be as efficient as they might try to be in terms of cost, that the legislature intended that two separate companies are going to have to pay insurance for this one employee, just in case one fails. I think the legislature wrote as many safeguards as possible in the Workers' Compensation Act. And didn't they write in those provisions that actually one employer would eventually bear the entire loss? They created a mechanism whereby the two employers that are jointly and severally liable could potentially settle their differences with some guidance? But eventually the statute suggests clearly that one employer would sustain the entire burden at the end of the day. I hate to parse that, but I think that they created a mechanism whereby parties could understand their relative rights against each other. Judge, I believe it's clear that the statute protects the injured worker by creating jointly and severally liable? Well, it protects the worker. True. It makes certain that that worker is never left without insurance. And this case is not one of those situations where that employee was left without coverage. The employee was not left without coverage? Yes. There was a hearing. The workers' compensation was provided for by TTC. Those payments were made up until the time that that company became insolvent. The fund then stepped in and made those payments. That employee has never been without workers' compensation coverage. And the statute, every provision has to be read together to make sense. And at the end of the day, one of the employers in the borrowing and loaning situation bears the burden of the entire loss. That's why the language allows them to flip-flop. I agree with you. The mechanism creates some certainty with regard to which of two insurance companies will eventually bear the burden. However. What's the point of that provision? The point of that provision is to give some certainty to the two insurance companies as to which of them should bear the loss. And the same to the loaning and borrowing employer. Give them some certainty that one of them is going to pay those premiums and ensure that risk while the other doesn't have to. But what you're suggesting is that an employee has to be covered by two policies if one of those companies becomes insolvent. They have to be paying double. And that's really what the court did by entering this. Because one policy of insurance never ensured this risk. But another policy did ensure this risk and paid the premiums and actually paid the benefits until that company became insolvent. Justice, if I could. I understand that. The point that I've been inelegantly trying to get to is that you're right. That mechanism in Section 1 creates some certainty as between the two insurance companies as to which will eventually bear this. But that's what brings us here today. We've got an insurance company and the guarantee fund. We're not an insurance company. We go behind insurance companies. Any valid collectible insurance, which is what the Virginia surety policy is with regard to the MGM workers at this location, any valid and collectible insurance goes first. That's the workers' concept. I mean, that's the... And I think we've reconciled the policy behind the fund and the provision and also the workers' compensation provisions because, in this case, we did have an insurance company that had ensured this risk and paid the premiums or the employer paid the premiums and then the payments were made to the injured worker until that company became insolvent. That's right. And then the non-insurance company, the guarantee fund... Yes. ...paid from there. Right. And what is the purpose of the fund? The purpose of the fund is... General purpose is what? The general purpose is to be the pot of last resort... Right. ...for people who don't have access to any other insurance policies. Right. And this is a case where the injured employee had a policy. The injured employee had a policy up until 2001, at which time he no longer had coverage by credit general. Right. And that's when the fund is supposed to step in because the other insurance companies are all contributing to the fund and all of us are contributing to that because we're paying for this availability of a fund to step in when an insolvent insurance company can no longer provide the coverage it was supposed to provide. Anyway, I think I understand your position. Anything further you want to add? Nothing for me. Anything further from that? Thank you very much. All right. Just briefly, it appears that you understand my argument completely. I think that counsel's, that Pelley's reading of the statute specifically, the Loaning and Borrowing Statute, has to be taken in a broader context. Well, what about counsel's argument that the Act does not allow for an employer not to cover every employee at a particular site? My response to you is that they did cover all their employees at that site. But you're saying that the loaned employee is not an employee then? I'm saying that they were actually employees of TTC and that the Loaning and Borrowing section of the Act, the 1A3, provides a mechanism to allow, to guarantee that an employee who in fact does get injured is allowed to access insurance from either one or the other. But what about the cases that say that the exclusivity provisions of the Workers' Compensation Act provide that an employee who's borrowed and loaned is essentially an employee of both the loaned employer and the borrowing employer? That's correct. It doesn't provide both of the positions, but that doesn't obviate the part of the statute in 1A3 that allows for the indemnification agreements. The Loaning and Borrowing employer can still contractually agree that one will indemnify the other. But counsel is arguing that the statute forbids an employer, such as MGM, from not covering loaned, borrowed employees, rather. And I appreciate that Section 4 does state that all employees at one location, and my reading is that that means the employees of that location for MGM were in fact just those 60 persons. Just because they're considered a Loaning-Borrowing relationship pursuant to Section 1A3 does not in fact convert them to all employees under Section 4, and that both portions of the statute have to be read together. And I agree that Section 1A3 has been put into place to guarantee that an employee can always access insurance. But it doesn't, I don't believe that that provision of the statute then somehow obligates employers to cover everyone that happens to be there, because they did, MGM did in fact cover its employees pursuant to Section 4 of the statute. And I would also say that there is an avenue, as counsel spoke about, that you can go in and ask for insurance and ask for a waiver. I don't think that's in this record, so I don't know really if we can talk about whether or not... Well, if someone were driving and dropping off a package to that location, and they are employed by someone, would they be covered too then? Well, by someone, if that's what you're asking, are you asking me would they be covered by my policy? Well, under the language of the statute, would anyone that comes to a particular site to do anything be considered an employee of that company, simply because they've made a delivery, they've, you know, dropped off materials? I mean... I don't think they would be under either the Loaning and Borrowing Statute or Section 4. I think that that's something the Commission would thusly look at. Is there a relationship, do we have control, I mean, all those other factors. So, thank you. All right. Case was well argued and well briefed, and it will be taken under advisement.